UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>KENNETH DUNLAVY,<br><br>Defendant. | Case No. 1:20-mj-00067-HBK-1<br><br>ORDER DENYING DUNLAVY'S MOTION TO STRIKE AND MOTION TO SUPPRESS<br><br>Doc. Nos. 12, 27 |

Defendant Kenneth Dunlavy was charged on July 20, 2020 in a three-count complaint with: (1) Simple Assault in violation of 18 U.S.C. § 113(a)(5); (2) Disorderly Conduct in violation of 36 C.F.R. § 2.34(a)(1); and Possession of a Controlled Substance in violation of 36 C.F.R. § 2.35(b)(2) stemming from an incident that occurred on July 10, 2020 in the Wawona section of Yosemite National Park.[1] (Doc. No. 1). Dunlavy filed a pretrial motion to suppress "all statements made to law enforcement personnel" by Dunlavy because they "were the byproduct of custodial interrogation in violation of *Miranda v. Arizona* 384 U.S. 436 (1966)." (Doc. No. 12 at 2). The government filed an opposition to Dunlavy's motion and Dunlavy filed an amended reply. (Doc. Nos. 16, 21).

Upon the parties' request, the Court held an evidentiary hearing via Zoom on August 25,

---

[1] The property at which the alleged incident took place is located within "Section 35" of Yosemite National Park where National Park Service has exclusive criminal jurisdiction but shares concurrent civil jurisdiction with California. The property is within the special and territorial jurisdiction of the United States.

2021 before the undersigned. (Doc. No. 26). At the evidentiary hearing, the government introduced the video recording of Dunlavy's arrest and subsequent interrogation as captured on the video camera worn by Ranger Julia Luchtenberg. The entirety of the rangers' encounter with Dunlavy between 18:01:46 and 19:01:28 was captured on Ranger Luchtenberg's body camera, which was attached as an exhibit to Plaintiff's opposition brief. (Exhibit 1, Doc. No. 16 at 7).

The government also offered the testimony of Ranger James Boyle. The government claims the body camera footage captured by Ranger Boyle during the arrest "was lost due to a technical issue that was disclosed to defense counsel." (*Id.* at 2). Because of its loss, Defendant orally moved under the Jenks Act to preclude Ranger Boyle's testimony at the evidentiary hearing. The Court permitted his testimony to proceed subject to briefing on the Jenks Act issue. As directed, Defendant filed a motion to strike Ranger Boyle's testimony under the Jenks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2. (Doc. No. 27). The government filed an opposition to the motion to strike. (Doc. No. 28).

Both motions are fully briefed and ripe for review. Having considered the evidence and applicable law, the Court denies Dunlavy's motion to strike Ranger Boyle's testimony and motion to suppress the statements made by Dunlavy to the rangers during his custodial interrogation.

## I. FACTUAL BACKGROUND AND FINDINGS

According to the criminal complaint, on July 10, 2020 at 14:21 Ranger Boyle responded to a report of domestic violence in Yosemite's Wawona area. (Doc. No. 1 at 1-2). Ranger Boyle met with the alleged victim, Julia Murnane, at the Wawona Ranger Station. (*Id.* at 2). She recounted that earlier that day her partner, Dunlavy Kenneth Dunlavy, had assaulted her during a dispute over Murnane's casino winnings. (*Id.*). Murnane fled her home located at 2635 W. Bruce Avenue, Wawona seeking shelter at a neighboring residence before being driven to the Wawona Ranger Station to file her report. (*Id.* at 1-2). Ranger Boyle noted Murnane had visible injuries to her forehead, neck, shoulder, left hand, back and lip. (*Id.* at 2).

After consulting with the United States Attorney and confirming that Dunlavy was renting the cabin at 2635 W. Bruce Avenue in Wawona, CA, Rangers Boyle and Luchtenberg arrived at

2

1  the cabin for purposes of arresting Dunlavy on Counts 1 and 2 set forth above.  (Doc. No. 1 at 2).
2  Upon arrival at approximately 18:00 hours, the rangers twice identified themselves as police
3  while knocking on the cabin's front door.  (Ex. 1 at 18:01:46 – 18:02:04).  When Dunlavy opened
4  the door, the rangers requested he step outside onto the home's deck, where he was promptly
5  arrested and handcuffed.  (*Id.* at 18:02:06 – 18:02:42).   The rangers told Dunlavy he was under
6  arrest for domestic violence but was not read his *Miranda* rights.  (*Id.*).  Dunlavy stated that he
7  was in "big trouble" because he had a separate warrant out for his arrest.  (*Id.* at 18:03:05 –
8  18:03:12).  The rangers conducted a search of Dunlavy for weapons and placed all items found in
9  his pockets, including his wallet, into a brown bag.  (*Id.* at 18:03:21 – 18:11:00).  Dunlavy
10 expressed concern over his arrest but was otherwise calm, coherent, and cooperative.  (*Id.* at
11 18:02:40 – 18:11:00).  He also asked for water, and Ranger Boyle assured him he would be
12 provided some.  (*Id.* at 18:03:21 – 18:03:24).

13         Rangers escorted Dunlavy from the cabin's deck to the ranger's patrol vehicle (a type of
14 SUV) and seated him in the back seat.  (*Id.* at 18:11:00 – 18:12:59).  The rangers, who were
15 joined by two other unidentified rangers, spent approximately 20 minutes in deliberation.  (*Id.* at
16 18:12:59 – 18:33:35).  Their conversations captured on the body camera during that period
17 primarily revolved around whether Dunlavy should be taken to the Yosemite jail or Fresno jail.
18 (*Id.* at 18:15:41 – 18:15:59, 18:19:02 – 18:20:18, 18:21:14 – 18:24:09, 18:25:56 – 18:27:12,
19 18:30:54 – 18:33:04, 18:35:01 – 18:35:13, 18:36:24 – 18:37:12, 18:39:39 – 18:39:41).  The
20 rangers were unsure which court had jurisdiction because Dunlavy was arrested on private land
21 but within the boundaries of Yosemite National Park.  (*Id.*).  Before "relocating" Dunlavy, the
22 rangers were also discussing how to ensure Murnane would have access to the cabin so that she
23 could retrieve her personal belongings.  (*Id.* at 18:27:12 – 18:27:27).

24         Dunlavy remained in the backseat of the ranger's patrol vehicle during these discussions.
25 (*Id.* at 18:11:00 – 18:33:35).  According the Record of Climatological Observations published by
26 the U.S. Department of Commerce, National Oceanic & Atmospheric Administration that was
27 attached to Dunlavy's amended reply and admitted into evidence at the evidentiary hearing as
28

1    Dunlavy Exhibit 1, the high temperature that day at Yosemite's nearby south entrance reached 82
2    degrees Fahrenheit, with a low of 54 degrees.  (Doc. No. 21-1 at 2).  The body camera footage
3    does not list the outside temperature.  It does, however, show that Dunlavy's arrest and
4    processing on the cabin's deck occurred after 6:00 p.m. and took place in a partially shaded area.
5    (Ex. 1 at 18:02:40 – 18:11:00).  Dunlavy was then seated in the backseat of the ranger's vehicle
6    which was shaded both by the trees surrounding the property and the sun's low angle in the late
7    afternoon sky.  (*Id.* 18:12:59 – 18:33:47).  Ranger Boyle testified that the ranger's SUV had air
8    conditioning and the vehicle's air conditioning was on.  The rangers had driven in this same
9    vehicle to the Dunlavy's rented home immediately before his arrest, suggesting the car
10   temperature would not have been excessively warm since it had been parked for a short period of
11   time even if it had not been left running.

12         While Dunlavy remained in the back of the police car, an unidentified ranger asked him if
13   he was feeling "comfy back there, not too hot, not too cold?"  (*Id.* at 18:20:49 – 18:20:53).
14   Dunlavy replied he was "a little hot."  (*Id.* at 18:20:53 – 18:20:56).  In response, Ranger
15   Luchtenberg increased the vehicle's air conditioning.  (*Id.* at 18:20:56 – 58).  Dunlavy responded,
16   "I appreciate that."  (*Id.* at 18:20:58 – 18:21:02).  Later, Ranger Luchtenberg turned the backseat
17   air conditioning to full blast.  (*Id.* at 18:25:05 – 18:25:16).  Dunlavy responded by thanking
18   Ranger Luchtenberg and remarking it was "way better."  (*Id.* at 18:25:16 – 18:25:25).  Ranger
19   Boyle also confirmed the backseat air conditioning was on full strength.  (*Id.* at 18:26:36 –
20   18:26:41).  The body camera does not capture Dunlavy mentioning the temperature again after
21   the air conditioning was turned up.

22         Dunlavy expressed being in discomfort from his handcuffs.  (*Id.* at 18:14:28 – 18:14:31).
23   Ranger Luchtenberg said she had personally observed Ranger Boyle place the handcuffs on him
24   and had ensured they were placed on properly and not overly tight.  (*Id.* at 18:14:31 – 18:14:38).
25   Dunlavy calmly replied that he understood.  (*Id.* at 18:14:38 – 18:14:43).  When Dunlavy later
26   complained that the handcuffs were "killing" him, Ranger Luchtenberg showed him how to
27   position himself and his arms in a more comfortable manner.  (*Id.* at 18:18:18 – 18:18:48).
28   Dunlavy replied he now felt "so much better," and told Ranger Luchtenberg "thank you so much"

and "I appreciate that." (*Id.* at 18:18:39 – 18:18:50). The body camera does not capture Dunlavy complaining about his handcuffs again.

Dunlavy made additional requests for water and was told by the rangers each time they would locate him some shortly. (*Id.* at 18:03:21 – 18:03:24, 18:08:10 – 18:08:12, 18:10:55 – 18:10:59, 18:12:57 – 18:12:59, 18:14:44 – 18:14:49). Ranger Luchtenberg searched her own belongings for water to no avail. (*Id.* at 18:14:54 – 18:15:35). She also confirmed with the other rangers on scene that they had no water. (*Id.* at 18:24:09 – 18:24:45). An unidentified ranger visited a nearby government building to see if they had water but he was unable to get inside. (*Id.* at 18:24:53 – 18:29:30). Ranger Luchtenberg updated Dunlavy that they were unsuccessful finding him water but would give him some as soon as possible. (*Id.* at 18:25:04 – 18:25:14).

At 18:33:35, approximately 20 minutes after Dunlavy was placed in the police car, the rangers drove Dunlavy to the Wawona Ranger Station. (*Id.* at 18:33:35 – 18:38:43). Along the way Dunlavy continued talking to the rangers, asking what would happen to his belongings left at the cabin, including his truck. (*Id.* at 18:33:39 – 18:36:24).

Their vehicle was met outside the Wawona Ranger Station by an unidentified park ranger who promptly gave Ranger Luchtenberg a bottle of water. (*Id.* at 18:38:48 – 18:38:59). She then offered the water to Dunlavy who took a few sips and, after he requested more, she poured water from the bottle slowly down Dunlavy's throat. (*Id.* at 18:39:07 – 18:39:27). Afterwards, Dunlavy stated he was "good." (*Id.* at 18:39:27 – 18:39:33). Dunlavy further commented that the water was "awesome" and thanked Ranger Luchtenberg. (*Id.*). At this point, Dunlavy does appear to be flushed in his face with slight perspiration. The body camera footage does not capture Dunlavy asking for water again.

Dunlavy remained in the back of the police car and continued to make small talk with the rangers in a clear and coherent manner. (*Id.* at 18:40:06 – 18:40:38). Up to this point the rangers had asked Dunlavy no questions beyond those relating to his comfort. Two minutes later, Ranger Luchtenberg opened Dunlavy's wallet stating she was looking for the winning ticket. (*Id.* at 18:42:42 – 18:44:15). While it is difficult to see from the body camera footage, the Complaint

indicates a receipt containing white powder fell out of the wallet. (Doc. No. 1 at 2). The body camera does capture Ranger Luchtenberg exclaiming "whoa" followed by her pointing at something and telling Officer Boyle it looks like "coke." (Ex. 1 at 18:42:43 – 18:43:13). She is seen brushing white powder from the seat. (*Id.*).

It is at this point that Ranger Boyle tells Dunlavy he would read him his "*Miranda* rights" and asked him if he knew what those were. (*Id.* at 18:44:00 – 18:44:13). Dunlavy responded "yeah." (*Id.* at 18:44:13 – 18:44:15). Ranger Boyle then proceeds to tell Dunlavy that anything he said could be used against him court, that he had the right to an attorney "during questioning," and that a lawyer would be provided if he could not afford one. (*Id.* at 18:44:20 – 18:44:34). Ranger Boyle finished by asking Dunlavy whether he understood his rights and he answered "yeah." (*Id.* at 18:44:34 – 18:44:37). Ranger Boyle next asked him whether he wanted to continue talking with the rangers, and Dunlavy emphatically responded "yeah." (*Id.* at 18:44:38 – 18:44:40). At the evidentiary hearing Ranger Boyle confirmed that Dunlavy expressly waived his *Miranda* rights.[2]

Once Mirandized, Dunlavy coherently recounted his side of the dispute with Murnane and admitted he was "yelling and screaming" at her. (*Id.* at 18:44:41 – 18:46:06). Dunlavy was then asked by Ranger Boyle what the "white powdery substance" in his wallet was. (*Id.* at 18:46:12 – 18:46:18). Dunlavy initially denied knowledge of the powder, but when Ranger Boyle asked whether it was "coke," Dunlavy replied that it was "meth." (*Id.* at 18:46:18 – 18:47:01). Dunlavy later admitted the meth was procured at "the casino." (*Id.* at 18:49:53 – 18:50:06).

The conversations, both between the rangers and between the rangers and Dunlavy, continued for at least fourteen more minutes. (*Id.* at 18:47:01 – 19:01:28). They primarily involve Dunlavy's transfer to Fresno, potential criminal charges he may face, how to handle his belongings left at the rented Wawona cabin, and how to secure the suspected drugs found in Dunlavy's wallet. (*Id.*). Dunlavy, who is not visible in the body camera footage, expressed exasperation and concern about the impending criminal charges and his truck being impounded.

---

[2] The admissibility of Ranger Boyle's testimony is discussed *supra*.

(*Id.* at 18:48:01-18:49:10, 18:56:54 – 18:57:10). Despite his frustration, Dunlavy was polite and coherent when speaking with the rangers and made no further mention about the heat or needing water. The rangers switched Dunlavy from handcuffs to "belly chains" and "leg irons" prior to the drive to Fresno. (*Id.* at 18:59:12 – 19:01:28). The body camera footage ends at 19:01:28 while Dunlavy's restraints were being exchanged, approximately one hour after he was arrested.

Dunlavy moves to suppress his statements to the rangers, arguing he was not properly Mirandized and that any waiver of his *Miranda* rights was coerced. (Doc. No. 12). Initially, Dunlavy's motion stated the body camera did not capture the rangers reading him his rights and that he had no recollection of being Mirandized. (*Id.* at 7). The government's opposition identified the body camera's timestamp where Dunlavy was audibly Mirandized. (Doc. No. 16). While the audio quality is low and faint, the body camera did record Ranger Boyle reading Dunlavy his *Miranda* rights and Dunlavy verbally waiving his rights. In his amended reply, Dunlavy concedes that the *Miranda* warnings were, in fact, given by Ranger Boyle. (*Id.* at 3). Dunlavy, however, argues any *Miranda* waiver was not voluntary and knowing and intelligent based upon the totality of the circumstances. (*Id.*). In support, Dunlavy submits that the waiver was coerced based upon the totality of the circumstances of Dunlavy's confinement before being interrogated, namely: the hot vehicle, his thirst, and the "stress position" with which he was confined in the vehicle caused by the handcuffs and his seated position inside the car with the doors closed. (*See generally* Doc. No. 21).

Dunlavy did not testify at the August 25, 2021 evidentiary hearing. In support of the coercive environment, Dunlavy relied upon the video-tape evidence from Ranger Luchtenberg's body camera and the Record of Climatological Observations published by the U.S. Department of Commerce, National Oceanic & Atmospheric Administration that reflects the high temperature for the day near Wawona was 82-degrees Fahrenheit with a corresponding low temperature of 54-degrees.

## II. APPLICABLE LAW AND ANALYSIS

### A. The Jencks Act

The Jencks Act holds that "[a]fter a witness called by the United States has testified on

1  direct examination, the court shall, on motion of the Defendant, order the United States to
2  produce any statement (as hereinafter defined) of the witness in the possession of the United
3  States which relates to the subject matter as to which the witness has testified."
4  18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2(a). ³ Defendants bear the burden of showing
5  particular materials qualify as Jencks Act statements. *United States v. Smaldone*, 544 F.2d 456,
6  460 (10th Cir. 1976).

7  If the government fails to deliver Jencks Act materials, "the court shall strike from the
8  record the testimony of the witness." 18 U.S.C. § 3500(d). However, the court has the discretion
9  to find the Jencks Act was not violated "[w]here the government's misplacing or destroying
10 relevant evidence is inadvertent." *United States v. McGrew*, 17 F. App'x 552, 554 (9th Cir. 2001)
11 (citing *United States v. Echeverry*, 759 F.2d 1451, 1456 (9th Cir. 1985). And where the court
12 finds the Jencks Act has been violated, it may forego sanctions if the nondisclosure did not
13 prejudice the defendant. *United States v. Well*, 572 F.2d 1383, 1384 (9th Cir. 1978).

14 Ranger Boyle wore a body camera throughout the arrest and subsequent detention of
15 Dunlavy. That footage "was lost due to a technical issue that was disclosed to defense counsel."
16 (Doc. No. 16 at 2). Dunlavy argues that Plaintiff was required to produce that video and that their
17 failure to do so constitutes a *per se* Jencks Act violation which requires Ranger Boyle's testimony
18 be stricken under a theory of strict liability. (*See* Doc. No. 27).

19 The Court is unpersuaded by Dunlavy's argument. All evidence before the Court suggests
20 the loss of Ranger Boyle's body camera footage was inadvertent. Plaintiff alerted Dunlavy to its
21 loss and provided him access to Ranger Luchtenberg's body camera, who accompanied Ranger
22 Boyle for most of the incident. There is no reason to believe Ranger Boyle's body camera was
23 destroyed for any reason other than technical issues, and Dunlavy does not suggest otherwise. In
24 accordance with Ninth Circuit precedent, the Court holds the Jencks Act was not violated because
25 the body camera destruction was inadvertent.

26
27
28 ³ Fed. R. Crim. P. 26.2 applies to suppression hearings. Fed. R. Crim. P. 12(h).

8

Even assuming, *arguendo*, that the destruction of the body camera footage constitutes a Jencks Act violation, the Court would still decline to strike Ranger Boyle's testimony. The Court possesses the discretion to forego sanctions where a defendant is not prejudiced. Ranger Luchtenberg's body camera captured Ranger Boyle's interactions with Dunlavy. While it would likely have been easier to hear Ranger Boyle administering the *Miranda* warning to Dunlavy on Boyle's own body camera, it remains audible on Ranger Luchtenberg's footage. There is also no suggestion the portions where Ranger Luchtenberg was separated from Ranger Boyle are relevant in determining whether Dunlavy verbally waived his *Miranda* rights. Finally, Ranger Boyle testified during the evidentiary hearing and was subject to thorough cross-examination by Defense Counsel. Because the Court finds the loss of Ranger Boyle's body camera did not violate the Jencks Act and that the body camera's loss did not prejudice Dunlavy, it will consider Ranger Boyle's testimony in considering the motion to suppress.

**B. Waiver of Miranda Rights**

Under the Fifth Amendment to the United States Constitution, "[n]o person...shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. Amend. V. The Supreme Court's landmark decision in *Miranda v. Arizona* clarified that when an "interrogation continues without the presence of an attorney and a statement is taken, **a heavy burden rests on the government** to demonstrate that the Dunlavy knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966) (emphasis added).

*Miranda* "imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, (1986). Once "taken into custody or otherwise deprived of his freedom of action in any significant way" the arrested individual must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444). A "defendant's 'waiver of Miranda rights must be voluntary, knowing, and intelligent.'" *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quoting *United States v. Binder*, 769

F.2d 595, 599 (9th Cir. 1985)).  In determining whether a *Miranda* waiver was voluntary, knowing, and intelligent, the Court must consider the "totality of circumstances," which may include (1) the defendant's mental capacity; (2) whether the rights were waived in writing; (3) whether the defendant appeared to understand his rights; and (4) whether the defendant had previous experience with the criminal justice system.  *United States v. Price*, 980 F.3d 1211, 1226 (9th Cir. 2019).  In assessing whether a statement was involuntary, "[c]ourts . . . often consider the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Tobias v. Arteaga*, 996 F.3d 571, 581 (9th Cir. 2021) (quoting *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003)).

Here, Dunlavy moves to suppress "all statements" made to the rangers because they "were the byproduct of custodial interrogation" in violation of *Miranda*.  (Doc. No. 12 at 2).  Initially Dunlavy denied he was Mirandized before stipulating in his amended reply that "the *Miranda* warnings were in fact given."  (Doc. No. 21 at 3).  Dunlavy nonetheless continues to deny he answered affirmatively when asked whether he wished to waive his rights after being Mirandized.  (Doc. No. 21 at 7-8).  But given that Dunlavy neither filed a declaration nor testified at the oral argument, the Court cannot consider Dunlavy's denial as evidence for purposes of deciding this motion.  Further, the Court's review of the body camera footage confirms that Dunlavy replied "yeah" both when asked whether he understood his rights and when asked whether he wished to continue talking with the rangers.  (Ex. 1 at 18:44:00 – 18:44:40).  Ranger Boyle likewise testified that immediately after being Mirandized Dunlavy told him he was waiving his rights. The question before the court, therefore, is limited to whether that waiver was voluntary, knowing, and intelligent.  *Garibay*, 143 F.3d at 536.

The Court concludes that under the totality of circumstances Dunlavy's waiver of his *Miranda* rights was voluntary, knowing, and intelligent.  Dunlavy's argument centers on the first and third prongs of *Price* – that Dunlavy's mental state and ability to understand his rights was diminished because "the heat of vehicle's interior left him disoriented and with difficulty giving

1   his full attention to Ranger Boyle or the ongoing interrogation." (Doc. No. 21 at 5).

2         Heat can form the basis for an improperly coerced waiver only when there are signs the
3   defendant was suffering from the heat because officers can "not have coercively exploited
4   something they were unaware existed." *United States v. Aldaco-Lugo*, 2010 WL 2721910, at *4
5   (D. Ariz. July 7, 2010). The body camera footage clearly shows the rangers were attentive to
6   keeping Dunlavy at a comfortable temperature. When Dunlavy said he was "a little hot" in
7   response to rangers' asking if the vehicle's temperature was comfortable, Ranger Luchtenberg
8   immediately adjusted the air conditioning to further cool the car. (Ex. 1 at 18:20:49 - 18:20:58).
9   She later turned the air conditioner to full blast and Dunlavy responded that it was "way better."
10  (*Id.* at 18:25:05 – 18:25:25). The body camera does not record Dunlavy mentioning the
11  temperature again. The video later captures Ranger Boyle confirming that the air conditioning
12  was on while they were awaiting Dunlavy's transport. (Ex. 1 at 18:26:36 – 18:26:41). No
13  evidence suggests that the rangers intended to subject Dunlavy to unnecessary overheating or that
14  that Dunlavy appeared overheated from the video.

15        While Dunlavy cites to a number of studies indicating hyperthermia reduces mental
16  function, (*see* Doc. No. 21 at 4-5), he presents no evidence that he actually suffered any heat
17  related injury during his arrest. Dunlavy did submit a chart indicating the high temperature near
18  Wawona the day he was arrested was 82 degrees Fahrenheit. (Doc. No. 21-1 at 2; Def.'s Exhibit
19  1). But the low temperature that day was 54 degrees, and Dunlavy's detention occurred between
20  6pm and 7 pm, well after the heat of the day. Further, he was placed in an air-conditioned vehicle
21  parked in the shade, and Dunlavy did not mention the heat after the air conditioning was turned
22  up to full strength. The video depicts Dunlavy as alert and coherent and his demeanor throughout
23  the body camera footage remains normal. The rangers therefore had no reason to believe
24  Dunlavy was overcome or afflicted by the heat, let alone that he suffered any heat injury. The
25  rangers could not exploit a condition that was not apparent.

26        Second, Dunlavy suggests he was coerced because he was dehydrated and only offered a
27  "sip" of water. (Doc. No. 21 at 2, 5). Deprivation of water can be coercive. *Wroten v. Felker*,
28  2009 WL 3171705, at *4 (C.D. Cal. Sept. 30, 2009). The body camera footage is clear the

1   rangers made multiple attempts to secure Dunlavy water, including searching their belongings
2   and searching nearby buildings.  (Ex. 1 at 18:14:54 – 18:15:35, 18:24:09 – 18:24:45, 18:24:53 –
3   18:29:30).  Dunlavy was provided water immediately upon arrival at the Wawona Ranger Station.
4   While he did not drink much of it, he did indicate he had had enough and expressed appreciation
5   for the water, calling it "awesome."  (*Id.* at 18:38:48 – 18:39:33).  He did not ask for water again.
6   The evidence is clear Dunlavy was provided water as quickly as the rangers located it, and there
7   is no evidence the rangers withheld water to coerce Dunlavy nor any evidence his mental acuity
8   declined as a result of dehydration.  Dunlavy's alleged heat illnesses therefore cannot be the basis
9   for invalidating his *Miranda* waiver.
10        Third, Dunlavy claims any *Miranda* waiver was coerced because his "metal handcuffs
11  d[ug] into his wrists."  (Doc. No. 21 at 5).  Waiving one's Miranda rights while in "unbearable"
12  pain can invalidate a waiver.  *Mincey v. Arizona*, 437 U.S. 385, 398 (1978).   Here, Dunlavy's
13  pain from the handcuffs appears bearable.  When Dunlavy told Ranger Luchtenberg his handcuffs
14  were "killing" him, Ranger Luchtenberg showed Dunlavy how to position his arms in a more
15  comfortable manner.  (*Id.* at 18:18:18 – 18:18:48).  Dunlavy said he felt "so much better"
16  afterwards and told Ranger Luchtenberg "thank you so much" and "I appreciate that."  (*Id.* at
17  18:18:39 – 18:18:50).  The body camera does not capture Dunlavy complaining about his
18  handcuffs again.  The rangers later swapped out Dunlavy's handcuffs for "belly chains" and "leg
19  irons" to provide greater comfort while riding to Fresno.  (*Id.* at 18:59:12 – 19:01:28).  Because
20  any pain the handcuffs caused was not unbearable it cannot form the basis for invalidating his
21  *Miranda* waiver.
22        None of the conditions in isolation or in combination created a coercive environment.
23  Instead, the video reflects that Dunlavy remained calm and coherent throughout his arrest.  He
24  asked pertinent questions about topics ranging from potential charges to the impounding of his
25  belongings left at the rented cabin.  He recognized the adverse consequences his arrest would
26  have on his job for missing work.  He explained why he had gotten into an argument with
27  Murnane over the winning ticket and his belief he was owed money for her past debts.  There is
28  therefore no reason to believe Dunlavy's waiver was coerced because his mental state rendered

him to unable to understand his rights and what was going on.

The other *Price* factors likewise do not invalidate Dunlavy's waiver. While Dunlavy did not waive his rights in writing, signing a written waiver is "not essential for waiver to occur" if the rights were waived orally. *United States v. Calise*, 996 F.2d 1019, 1022 (9th Cir. 1993). Here, Dunlavy was read his rights and orally indicated he understood them and wanted to continue talking with the rangers. (Ex. 1 at 18:44:00 – 18:44:40). Additionally, while the record does not indicate the nature of Dunlavy's criminal history, he does acknowledge at the inception of his arrest that there was an outstanding warrant for his arrest. (*Id.* at 18:03:05 – 18:03:12). Dunlavy's comment indicates familiarity with the legal process and by extension the rights it provides. He further attested he was familiar with his *Miranda* rights. (Ex. 1 at 18:44:13 – 18:44:15). Because the government has shown the totality of circumstances reflect Dunlavy's waiver of his Miranda rights was voluntary, knowing, and intelligent, the Court denies Dunlavy's motion to suppress his statements to the rangers during his arrest and processing.

### III. CONCLUSION

Based upon a review of the record and evidence, the Court finds no basis under the Jencks Act to strike Ranger Boyles testimony from the evidentiary hearing. The Court further finds the totality of the circumstances reflect Dunlavy validly waived his *Miranda* rights.

Accordingly, it is ORDERED:

Dunlavy's motion to strike (Doc. No. 27) and motion to suppress (Doc. No. 12) are DENIED.

Dated: September 23, 2021

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

13